**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3245
_____

GOVERNMENT OF THE VIRGIN ISLANDS

v.

MICHAEL LEWIS,

Appellant

_____

On Appeal from the District Court
of the Virgin Islands, Appellate Division
(Crim. No. 2002-56)
Judges:  Hon. Raymond L. Finch, Hon. Curtis V. Gomez,
and Hon. Patricia D. Steele

_____

Argued May 3, 2010

_____

Before:  SMITH, CHAGARES, and JORDAN, Circuit Judges.

(Filed  September 8, 2010)

_____

David J. Cattie, Esq. (Argued)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1336 Beltjen Road, Suite 201
St. Thomas, VI 00802
        Counsel for Appellant

Ernest Bason, Esq.
Richard S. Davis, Esq. (Argued)
Office of the Attorney General of the Virgin Islands

Department of Justice
34-38 Kronprindsens Gade, GERS Complex, 2nd Floor
Charlotte Amalie, St. Thomas, VI 00802
        Counsel for Appellee

_____

OPINION

_____

CHAGARES, Circuit Judge.

Michael Lewis was convicted of unlawful possession of a firearm in the Territorial Court of the Virgin Islands, and was sentenced to fifteen years in prison. He appealed to the District Court of the Virgin Islands, Appellate Division, which affirmed the conviction and sentence. He now appeals to this Court, arguing principally that the trial court committed plain error by failing, sua sponte, to instruct the jury on the affirmative defense of justification. For the reasons that follow, we disagree. We will affirm the conviction without prejudice to Lewis's right to challenge his trial counsel's effectiveness in a collateral proceeding.

I.

This case revolves around the fatal shooting of Mackellis George. At approximately 2:15 a.m. on September 29, 1998, Lewis drove to the Callwood Command police station on the island of St. Thomas and began yelling to Lieutenant Randolph DeSuza that someone had just shot his friend. DeSuza approached and discovered George, lying bloodied and fully reclined in the passenger seat of the car that Lewis was driving. DeSuza directed Lewis to follow him to a nearby hospital. Upon their arrival, DeSuza contacted George's family to inform them of the shooting.

At the hospital, Lewis told DeSuza and George's family that George had been shot in a drive-by shooting, but Lewis gave conflicting details about the incident. He first claimed that he had not seen the color or make of the vehicle the shooter had driven. He later claimed that the color of the shooter's car was white. Still later, he said that it was blue. Lewis's uncle, who was at the

2

hospital, told police that his nephew obviously was lying, and suggested that his hands be checked for gunpowder – whereupon Lewis doused his hands with rubbing alcohol sitting on a nearby table. Meanwhile, a police officer overheard Lewis's grandmother mention that Lewis had shot and killed a dog earlier in the day. The dog's body was recovered, and forensic tests ultimately showed that George and the dog had been shot by the same gun. George died from the gunshot wounds.

Lewis was charged in a two-count information with first-degree murder, in violation of V.I. Code Ann. tit. 14, § 922(a), and unlawful possession of a firearm, in violation of V.I. Code Ann. tit. 14, § 2253(a). He testified in his own defense, proffering yet another version of events, which was as follows. Days before the shooting, George provided Lewis with a drink that caused him to fall asleep at George's residence. Lewis awoke to find George lying behind him, sexually assaulting him. Although he tried to avoid George after that incident, Lewis went to George's residence on the evening of September 28 to collect some of his personal belongings. When he arrived, George became enraged, accusing Lewis of telling others that he (George) was a homosexual. George pulled out a firearm, began "bursting" shots into the ground, and then, pointing the gun at Lewis, ordered him to get into the passenger's seat of George's car. Appendix ("App.") 939.

Lewis testified that George began to drive, and at some point started insulting him and "pushing" the gun repeatedly into his (Lewis's) head. In response, Lewis testified, he grabbed for the gun and a struggle ensued. He claimed that the gun fired several times during the struggle, but that he ultimately gained control of it and shot George in self-defense. Lewis testified that he then put George in the passenger's seat. After "a while," Lewis noticed that George "look[ed] . . . dead" and that his shirt had ripped. App. 946-47. According to his testimony, this caused him to realize that others would want to know why George's shirt had been ripped. Consequently, he stopped at a roadside "garbage pan" and discarded the gun and George's shirt. App. 947-48. He then proceeded to the police station and, ultimately, the hospital. Lewis admitted at trial that he fabricated the phony drive-by shooting story because he did not think anyone would believe that he had

3

shot George in self-defense.[1]

At the close of trial, the Government and Lewis submitted proposed jury instructions to the trial court. Lewis specifically requested that a self-defense instruction be given to the jury with respect to the murder charge, but did not request that a justification instruction be given with respect to the unlawful possession charge. The trial court instructed the jury as Lewis requested. The jury thereafter acquitted Lewis of murder but convicted him of unlawful possession of a firearm, and the trial court sentenced him to fifteen years in prison. The Appellate Division affirmed the conviction and sentence, and Lewis filed this timely appeal.[2]

II.

Lewis argues that his conviction for unlawful possession of

---

[1] Although it is not directly pertinent to the central issue on appeal, we note that the Government introduced substantial testimonial and forensic evidence that undercut much of Lewis's exculpatory account. For instance, of the three bullets that hit George, one had been fired from more than three feet away, one had been fired from a distance of two or three feet away, and the last had been fired from less than two feet away. That George was shot from a distance of more than three feet away strongly suggested that he could not have been struggling for the gun at the time he was shot. Additionally, there were no bullet holes in the car's body or windows, and no bullets, cartridge casings, or blood spatter patterns anywhere inside the car. Finally, George's mother testified that before the shooting, Lewis and her son were talking outside of her home, but that the conversation was not heated, and that she never heard any gunshots fired outside her home. This undermined Lewis's claim that George became enraged and fired his gun into the ground.

[2] The Appellate Division had jurisdiction pursuant to 48 U.S.C. § 1613a(a), and we have jurisdiction pursuant to 48 U.S.C. § 1613a(c).

4

a firearm[3] must be vacated because the trial court failed to instruct the jury on the affirmative defense of temporary justified possession. He premises this argument on his theory that he possessed the gun only long enough to defend himself in the car. Thus, he argues, the jury should have been instructed to consider whether his possession of the firearm was a legal necessity. Lewis concedes that he did not request the trial court to give the instruction that he now claims was required, so we review only for plain error. Gov't of the V.I. v. Fonseca, 274 F.3d 760, 765 (3d Cir. 2001).[4]

The plain error "standard is met when there is an 'error' that is 'plain' and that 'affects substantial rights.'" United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)); see also Fed. R. Crim. P. 52(b). A court's deviation from a legal rule constitutes "error." United States v. Turcks, 41 F.3d 893, 897 (3d Cir. 1994). A "plain" error is one that is "clear" or "obvious." Id. An error "affects substantial rights" if it was prejudicial – that is, if it affected the outcome of the trial proceedings. Id. Even if this standard is satisfied, Rule 52(b) leaves "the decision to correct the forfeited error" to our discretion. United States v. Tann, 577 F.3d 533, 535 (3d Cir. 2009). We exercise that discretion "sparingly," and will correct the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." Id.

---

[3] Section 2253(a) of the Virgin Islands criminal code prohibits anyone, "unless otherwise authorized by law," from "ha[ving], possess[ing], bear[ing], transport[ing,] or carr[ying,] either[] actually or constructively, openly or concealed[,] any firearm . . . ." V.I. Code Ann. tit. 14, § 2253(a). The trial court sentenced Lewis under the habitual offender statute, V.I. Code Ann. tit. 14, § 61(a), and although he unsuccessfully appealed his sentence to the Appellate Division, Lewis does not challenge it here.

[4] To be precise, we review the Appellate Division's analysis de novo, applying the same standard of review – plain error – that the first appellate tribunal was required to apply. Semper v. Santos, 845 F.2d 1233, 1235-36 (3d Cir. 1988).

We first consider whether the trial court erred by failing, sua sponte, to instruct the jury on the affirmative defense of justification. "As a general proposition, 'a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.'" Gov't of the V.I. v. Isaac, 50 F.3d 1175, 1180 (3d Cir. 1995) (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)). We must, therefore, view the facts "in the light most favorable to" Lewis and "determine whether there was evidence presented to support the theory of justification . . . ." United States v. Paolello, 951 F.2d 537, 539, 542 (3d Cir. 1991).[5]

---

[5] The Appellate Division first analyzed whether a justification defense is available at all, as § 2253(a) makes no reference to any affirmative defenses. Unable to find any Virgin Islands case law specifically directed to § 2253(a), the Appellate Division looked to our decision in Paolello, in which we held that a justification defense is available in prosecutions instituted pursuant to the federal felon-in-possession statute, 18 U.S.C. § 922(g), which also contained no reference to affirmative defenses. We explained "that Congress legislated against the backdrop of the common law[,] which has historically recognized th[e justification] defense," and we therefore concluded that such a defense was available under the statute. Paolello, 951 F.2d at 541.

Noting that §§ 922(g) and 2253(a) are substantially similar provisions, the Appellate Division concluded that a common-law justification defense likewise applies to unlawful-possession prosecutions in the Virgin Islands. Both parties agree with this conclusion, and so do we. While in Paolello we "confin[ed] our opinion to what [wa]s before us," id. at 542 n.5, we perceive no sound reason why our reasoning should not apply with equal force to § 2253(a) prosecutions. We also discern nothing in § 2253(a) that would place the burden on the Government to demonstrate the defendant's ineligibility for a justification instruction. Because a justification defense against a § 2253(a) prosecution – like those instituted pursuant to § 922(g) – would not negate an element of the offense, we conclude that the burden rested with Lewis to establish his eligibility for the instruction by a preponderance of the evidence. See United States v. Dodd, 225 F.3d 340, 350 (3d Cir.

6

Our decision in Paolello is of central importance here, so we discuss the case in some detail. The defendant, Paolello, was involved in a physical altercation with another person outside a bar. Nearby police officers heard a gunshot and, upon approach, they heard a bystander yell, "he's got a gun." Id. at 538. Moments later, the officers saw Paolello run into an alley. They gave chase, and saw that Paolello had a pistol in his hand. One of the officers yelled, "freeze, police," and at some point thereafter Paolello stopped, turned around, and threw his weapon to the ground. Id. He was apprehended and charged with being a felon in possession of a firearm, and he requested at trial that the jury be instructed on the defense of temporary justified possession.

Paolello, along with his stepson, testified that he (Paolello) had been accosted by another man upon leaving the bar, and that the man had a gun. Paolello testified that the man punched his stepson in the face, fired a shot into the air, and that a struggle then followed. Paolello testified that he was able to knock the gun from the man's hand, at which time he grabbed it to avoid being shot, and then ran. He claimed that he immediately released the gun

2000) (holding that the defendant bears the burden of demonstrating entitlement to a justification instruction in felon-in-possession prosecution).

In the absence of controlling Virgin Islands precedent, we believe that our analogy to Paolello and other § 922(g) cases is necessary to decide the case before us. We are mindful, of course, that the authority to interpret § 2253(a) lies centrally with the newly created Supreme Court of the Virgin Islands. See Pichardo v. V.I. Comm'r of Labor, __ F.3d __, __, No. 08-4259, 2010 U.S. App. LEXIS 13957, at *2 (3d Cir. July 8, 2010) (holding that this Court will "defer to decisions of the Supreme Court of the Virgin Islands on matters of local law unless we find them to be manifestly erroneous"). We do not mean by our decision today to preclude the Supreme Court of the Virgin Islands from offering its own interpretation of § 2253(a), and whether and under what circumstances a justification defense is available. Until that day comes, however, we decide this case applying our most analogous precedent.

7

when he realized that police officers were behind him. The district court denied the requested justification instruction and the jury found Paolello guilty.

We vacated the conviction. We adopted a four-part test to determine whether a justification defense is available to a defendant charged under § 922(g) with unlawfully possessing a firearm. To meet this test, we explained, the evidence must demonstrate that a jury reasonably could conclude the following: (1) that the defendant was under an unlawful and present threat of death or serious bodily injury; (2) that he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) that he had no reasonable legal alternative to both the criminal act and the avoidance of the threatened harm; and (4) that there was a direct causal relationship between the criminal act and the avoidance of the threatened harm. Paolello, 951 F.2d at 540-41.

We also explained that the test should be applied restrictively, requiring a "defendant [to] meet a high level of proof to establish the defense of justification." Id. at 542; accord United States v. Alston, 526 F.3d 91, 94-95 & n.5 (3d Cir. 2008) (noting that the justification defense is "rarely granted" and "should be construed narrowly"). In endorsing this restrictive view, we approved as "sound" the requirement that "an interdicted person possess the firearm no longer than absolutely necessary." Paolello, 951 F.2d at 541.

Applying the test, we held that "the evidence presented by Paolello, if believed, supported his defense, and [that] the district court should have instructed the jury accordingly." Id. at 542. We first explained that sufficient evidence existed to permit a jury to conclude that "Paolello was subject to a threat of death or serious bodily harm." Id. Indeed, both Paolello and his stepson testified that a man had attacked him outside the bar, brandished and then fired a gun, and that Paolello then knocked the gun out of his hand and picked it up to avoid his "well-grounded fear" of being shot. Id. Second, we explained that Paolello had not recklessly placed himself in a position to commit criminal conduct, as he had done no more than attend "a public place of business." Id. at 541.

8

Finally, we concluded that, viewing the evidence in Paolello's favor, the third and fourth requirements had been satisfied. Because it is pertinent to our analysis in this case, we quote our reasoning at length:

> [T]he evidence supported a conclusion that Paolello did not have a reasonable opportunity to escape the threatened harm without taking the gun, and that there was a direct causal relationship between that action and the avoidance of the threatened harm, i.e., being shot. Paolello stated that he grabbed the gun after it had fallen to the ground to avoid being shot or to prevent [his stepson] from being shot. He ran down the alley with the gun because he was afraid the man or his friends would attack him. This testimony indicates that there was no other way for Paolello to take preventive action other than by grabbing the weapon. It is true that [an officer] testified that he chased Paolello down the alley, ordering him to stop running and identifying himself as a policeman, and that Paolello disobeyed the orders. If [the officer's] testimony is believed, this would severely undercut Paolello's justification defense because it would appear that Paolello <u>had an opportunity to dispose of the gun and stop running earlier than he did, so that he possessed the firearm longer than absolutely necessary</u>.
>
> Yet Paolello testified that, in contrast to [the officer's] rendition of the events, he ran down the alley because he was afraid that the man who had punched [his stepson] and had argued with Paolello would instruct his "friends" to chase Paolello. He also testified that as he "was running into the alleyway, I didn't know anybody was behind me. . . . I heard somebody say 'Stop,' you know? And I turned around, and I dropped the gun. . . . He said 'I'm an officer' and I just stopped." Because we must accept in the procedural posture of this case Paolello's version of the facts in the record, <u>it appears that Paolello did not maintain possession of</u>

9

> the weapon any longer than absolutely necessary. Thus, even if we find Paolello's testimony unpersuasive, his credibility should be judged by the jury. In sum, Paolello put forth sufficient evidence concerning each of the elements of the justification defense and the district court should have instructed the jury on that theory.

Id. at 542-43 (emphases added, ellipses in original, footnote and citations omitted).

In this case, the Appellate Division concluded that the first and second Paolello requirements had been satisfied. We agree. Viewing the relevant evidence in the light most favorable to Lewis, we reject the Government's argument that the episode involved "little more than . . . an angry friend who was carrying a gun and insulting [Lewis]." Gov't Br. at 15. Lewis's testimony that George brandished a firearm, fired several shots into the ground, and then pointed the gun at Lewis and ordered him into the car (after which George several times "pushed" the gun into Lewis's head), could reasonably be viewed by a jury as an imminent threat on Lewis's life. We also reject the Government's argument that Lewis recklessly placed himself in danger when he got into the car. Viewing Lewis's testimony in his favor, we agree with the Appellate Division that a jury could determine that he only entered the car at an armed and angry man's directive – and reasonably so.

The Appellate Division next concluded that the third Paolello requirement – that Lewis had no reasonable legal alternative to both the criminal act and the avoidance of the threatened harm – had been satisfied in part. Specifically, the court explained that a jury could conclude that Lewis could not have avoided the threat George posed without taking immediate possession of the gun while in the car. We agree. Lewis's testimony on this point is materially indistinguishable from our conclusion in Paolello that the defendant did not have a reasonable alternative to being shot without possessing the gun. See Paolello, 951 F.2d at 542. If Lewis's account is believed, a jury could conclude that taking possession of the gun was Lewis's only viable alternative to being shot.

10

Quoting a decision by the Court of Appeals for the Tenth Circuit, however, the Appellate Division suggested that "[s]ome attempt to place [the] pistol into the hands of the police is an irreducible minimum in evaluating" whether a defendant is entitled to a temporary justification defense. App. P (quoting United States v. Al-Rekabi, 454 F.3d 1113, 1123 (10th Cir. 2006)). The Appellate Division concluded, in essence, that Lewis did not take sufficient corrective action after the altercation to make him eligible for a justification instruction. The court reasoned that "Lewis never reported the gun to the police[] or attempted to leave the gun in a safe place where it could be found by police. Rather, Lewis disposed of the gun in a 'garbage pan' where it could have been easily found by others." App. O. Additionally, the Appellate Division explained, Lewis's own testimony demonstrated that he "maintained possession of the firearm in order to hide it and avoid responsibility for the shooting," App. N, and therefore did not throw the gun in the "garbage pan" until after he determined that the circumstances were such that he could be criminally implicated. App. O (citing App. 947-48).[6] "Lewis'[s] failure to contact the

---

[6] Lewis's relevant testimony was as follows:

> Q. Now, where did you go after Mr. George sustain[ed] the injuries?
>
> A. I tried to push the man over in the passenger seat. I recline[d] the seat.
>
> Q. So, he was in the driver's side?
>
> A. Yes.
>
> Q. And what did you do next?
>
> A. I put him over in the passenger seat.
>
> Q. And what happened?

11

A. I start looking around, you know. I see h[is] shirt rip up . . . , so I start driving and I start to wonder what it is I going to do, and I look at the man and when I look at him, I realize where he get shoot, I see he get shoot in his face or . . . some place else, so I say he look like he dead.

A. And what did you do?

Q. I just been there for a while wondering what to do and I just start driving and as I start driving, [there] is a garbage pan in that area, that's when I notice, I say they going – people going to want to know how come his shirt rip and all of that, so I take his shirt and the gun and I throw it in the garbage pan and I keep on going, and I went straight, come down Contant Hill, come straight down, went straight up town, while going towards the hospital, Officer Allan happen to be walking out the police station and I see him, so I stop, I stop and I tell the man somebody just shot – somebody just shot my partner. I never get out the car or nothing, I just told the man that. Another officer came, flash the flashlight, look at me, look at him, and . . . he say go,

12

authorities or to safely dispose of the gun," the court concluded, "rendered a jury instruction on the justification defense inappropriate." App. P.

Lewis argues that the Appellate Division erroneously extended <u>Paolello</u> by imposing an affirmative obligation to place the gun in the hands of the police before a justification instruction will be appropriate. To the extent that the Appellate Division fashioned a bright-line rule that applies uniformly to an infinite universe of factual scenarios (and it is unclear whether it did), we agree. Nothing in <u>Paolello</u>'s logic or letter mandates a pre-ordained course of conduct that is required for a criminal defendant to become eligible for a justification instruction, and we decline to prescribe one now. <u>See</u> <u>United States v. Ricks</u>, 573 F.3d 198, 204 (4th Cir. 2009) (rejecting the Government's argument that a "bright-line rule that the only reasonable way for a felon to dispossess himself of a gun he has justifiably come to possess is to turn that gun over to the police"). Indeed, in <u>Paolello</u> itself, the defendant did not hand the firearm to the police officers, yet we held that he was entitled to the requested instruction.

Our decision in <u>Paolello</u> does, however, set forth general parameters to which a defendant's conduct must adhere. Multiple times we explained that a defendant who possesses a firearm any "longer than absolutely necessary" would be ineligible for a justification instruction. <u>Paolello</u>, 951 F.2d at 541-43; <u>accord</u> <u>United States v. White</u>, 552 F.3d 240, 248 (2d Cir. 2009); <u>United States v. Mooney</u>, 497 F.3d 397, 408 (4th Cir. 2007) (concluding that a defendant was entitled to a justification instruction, in part because he "did not unnecessarily delay or detour at any point" in dispossessing himself of the gun, and because his "manifest intention from seizure to hand-over was the single-minded effort to rendezvous with the police"); <u>United States v. Singleton</u>, 902 F.2d 471, 473 (6th Cir. 1990) (holding that a defendant asserting a

---

go, go . . . . I just went . . . straight to the hospital by myself.

App. 947-48.

13

necessity defense must "show that he did not maintain possession any longer than absolutely necessary"); United States v. Parker, 566 F.2d 1304, 1305-06 (5th Cir. 1978) (concluding that a defendant was not entitled to a justification instruction where he retained possession of a gun for up to thirty minutes after being attacked in his home).

A natural and logical corollary to this requirement is that the defendant must dispossess himself of the firearm in an objectively reasonable manner. See Ricks, 573 F.3d at 203 (agreeing with the Government that "a defendant seeking a justification instruction must produce evidence that he took reasonable steps to dispossess himself of the weapon once the threat entitling him to possess it abated" (quotation marks omitted)); Al-Rekabi, 454 F.3d at 1123 ("Although some leeway needs [to] be given to individuals responding to an emergency, they must still act in the most responsible manner available under the circumstances.").[7]

Although we did not expressly require in Paolello that a defendant must dispose of the weapon in a reasonable fashion, we had no occasion to do so. The police officers were in the immediate vicinity of the weapon that Paolello discarded, and thus recovered the weapon immediately upon apprehending the defendant. We explained that Paolello's testimony, if believed, indicated that he dropped the weapon as soon as he realized that law enforcement officers were in the vicinity.

Clearly implicit in our analysis, then, was the premise that dropping the firearm in the alley was a reasonable response to the officers' directives for Paolello to freeze. In sum, we believe that a reasonableness requirement flows inexorably from the principles

_____

[7] We do not read, as Lewis apparently does, the Court of Appeals for the Tenth Circuit's statement in Al-Rekabi – that handing the gun to police is "an irreducible minimum" – as prescribing any bright-line rules. Rather, it is clear that the court merely set forth a minimum standard of acceptable conduct. Indeed, the court listed other potential alternatives that the defendant could have undertaken, such as returning the gun to the owner or attempting to leave it in a safe place where it could be found by the police. Al-Rekabi, 454 F.3d at 1123.

14

upon which Paolello is premised. It is entirely proper – and entirely consistent with our restrictive application of the test set forth in Paolello – to "[d]emand[] a prompt and appropriate remedial response to the claimed 'necessity' . . . ." Al-Rekabi, 454 F.3d at 1124 (emphasis added). We agree, moreover, with those courts of appeals holding that a defendant's efforts to dispossess himself of the gun must be assessed for reasonableness under all relevant circumstances. See Ricks, 573 F.3d at 203-04; Al-Rekabi, 454 F.3d at 1123.

In light of the factual circumstances presented by this case, we now refine Paolello: in order to satisfy the third requirement for a justification instruction, a defendant (1) must possess the firearm no longer than is absolutely necessary to avoid the imminent threat; and (2) must dispossess himself of the gun in an objectively reasonable manner once the threat has abated.[8]

Applying these standards, we conclude that Lewis did not meet his burden of establishing that he was entitled to a justification instruction. We accept, arguendo, Lewis's assertion that, because the altercation occurred inside the car, instantaneous dispossession of the weapon may not have been a feasible choice. For example, if Lewis had immediately flung the gun out of the car's window, he would be particularly ill-situated to argue that his response, albeit immediate, was reasonable. In such circumstances, Lewis argues that he faced a "Hobson's choice": either immediately dispossess himself of the gun – and risk it later being deemed unreasonable, or wait to dispossess himself of the gun until flagging down a police officer – and risk it later being deemed too late.

Whatever merit such an argument has in the abstract, we easily reject it here. If Lewis had either (1) immediately discarded the firearm from the car, or (2) waited until arriving at the police

---

[8] A defendant must, of course, continue to establish that the possession of the firearm was absolutely necessary in the first place – that "he had no reasonable legal alternative []to both the criminal act and the avoidance of the threatened harm[]." Paolello, 951 F.2d at 540.

station to hand the gun over to Lieutenant DeSuza, perhaps we might have been forced to weigh the relative merits of greater expediency versus greater safety. But Lewis availed himself of neither alternative, and we must assess the reasonableness of what he actually did, not what he could have done. Cf. Al-Rekabi, 454 F.3d at 1124 ("A claim of necessity may be little more than an ex-post attempt by defense counsel to exculpate a client. Such a claim is easily made and so must be factually justified."). Rather, Lewis's "cavalier response," id. at 1123, was anything but a reasonable effort to dispossess himself of the gun.

Lewis admitted unequivocally that he decided to discard the gun in the garbage pan: (1) after "wondering what to do" "for a while," App. 947; (2) upon noticing that George appeared dead, id.; and (3) upon realizing that "people going to want to know how come [George's] shirt [was] rip[ped]." App. 948. His testimony reveals that it was these facts that prompted him to discard the weapon into the garbage pan. When he reached Lieutenant DeSuza, he intimated (falsely) that someone else had "just shot [his] partner." Id. Continuing the charade, he lied outright at the hospital when he stated that George had been shot in a drive-by shooting. Lewis further admitted at trial that he concocted the drive-by shooting story because he thought that no one would believe his self-defense story. App. 958. We reject Lewis's proposition that his false accounts after he disposed of the gun are irrelevant to determining whether his dispossession was objectively reasonable. They reveal his underlying motivations in discarding the gun, and, while subjective motivations do not determine objective reasonableness, they can give insight. When the motive is a self-serving cover-up, as it was here, the likelihood that the dispossession will be objectively reasonable is drastically reduced.

We are required, of course, to view the evidence in the light most favorable to Lewis. Even in that light, Lewis's testimony is devoid of anything that would support the notion that his behavior was reasonable. While we might imagine a scenario in which discarding a weapon into a dumpster is objectively reasonable, that is not the case here. Far from evincing a "single-minded effort" to divest himself of the gun safely, return it to law enforcement officers, or even to report to authorities the circumstances necessitating his possession of it, Lewis's own testimony

16

demonstrates just the opposite: a furtive effort to obscure from law enforcement his role in George's death, as well as the physical evidence substantiating it. Indeed, Lewis's testimony establishes that he acknowledged neither his role in the shooting nor his conduct after the shooting until his first few exculpatory accounts proved futile.

We recognize that generally "the reasonableness of the defendant's course of conduct is a question for a jury." Ricks, 573 F.3d at 204; cf. Paolello, 951 F.2d at 543 ("[E]ven if we find Paolello's testimony unpersuasive, his credibility should be judged by the jury."). But this rule is not so strict that it strips the trial court of its gatekeeping function entirely. See Al-Rekabi, 454 F.3d at 1123 (explaining that when reviewing a court's refusal to give a necessity instruction, "[w]e respect the trial judge's role as gatekeeper"). We have little difficulty holding that a surreptitious effort to secrete a firearm in order to evade criminal sanction is not a reasonable mode of dispossession. Rather, we conclude that such conduct cannot satisfy the objective requirement that a defendant "act in the most responsible manner available under the circumstances." Al-Rekabi, 454 F.3d at 1123.[9]

Under Paolello as we have refined it, we conclude that the evidence in this case cannot support a justified possession defense with respect to the § 2253(a) charge. Accordingly, the trial court's failure to provide a justification instruction in this case was not error,[10] and thus does not afford a basis for disturbing Lewis's

---

[9] Because we conclude that Lewis did not satisfy the third Paolello requirement, we need not discuss whether he satisfied the fourth.

[10] Although, as we have said, a reasonableness requirement logically follows from our decision in Paolello, we recognize that the opinion does not refer explicitly to "reasonable" dispossession. Even assuming that one could interpret Paolello's literal terms to have required the trial court to provide a justification instruction, the opinion is not so clear as applied to the particular factual circumstances presented here to rise to the level of a "plain" error. Given Lewis's admitted obfuscatory conduct, neither Paolello nor

conviction.[11]

III.

Lewis also argues that his trial counsel was constitutionally deficient under Strickland v. Washington, 466 U.S. 668 (1984). He

---

any of our other cases, see, e.g., United States v. Gray, 878 F.2d 702 (3d Cir. 1989) clearly compelled the trial court to give a justification instruction. Rather, the application of Paolello at the time of Lewis's trial was, at most, "subject to reasonable dispute" insofar as it pertained to the factual circumstances of this case. Puckett v. United States, 129 S. Ct. 1423, 1429 (2009). Such a reasonably debatable issue does not rise to the level of plain error. Id. Even if one could characterize the trial court's failure to provide a justification instruction as "error" under the jurisprudence of the day, such an error was hardly clear or obvious.

Moreover, trial courts generally are under no duty to raise affirmative defenses on behalf of a criminal defendant. See, e.g., United States v. Atkins, 487 F.2d 257, 259 (8th Cir. 1973) (finding no plain error in the trial court's failure to give an alibi instruction sua sponte because "[a] trial court need not give such an instruction in the absence of a request therefor"); Roper v. United States, 403 F.2d 796, 798 (5th Cir. 1968) (same); United States v. Sferas, 210 F.2d 69, 71 (7th Cir. 1954) ("[A]ppellate courts will not, generally speaking, pass upon defenses which have not been previously brought to the attention of the trial court."). Indeed, by raising affirmative defenses sua sponte, a trial court might actually harm a criminal defendant by undermining defense counsel's strategic decisions. Cf. United States v. Van Kirk, 935 F.2d 932, 934 (8th Cir. 1991) ("[A] competent defense lawyer could well have concluded that urging an entrapment defense . . . would have undermined the effort to avoid all the charges on the ground that the defendant was simply not guilty.")).

[11] Lewis argues that, should we agree that the conviction must be vacated, the Double Jeopardy Clause, U.S. Const. amend. V, bars a retrial. Our conclusion that the conviction be affirmed renders Lewis's Double Jeopardy claim moot.

18

asserts two independent claims.  First, he contends that counsel was deficient by failing to request the justification defense discussed above.  Second, he contends that counsel was deficient because he failed to object to both the Government's references to his nickname ("Rambo") and his alleged possession of a knife many years before.

Lewis acknowledges the well-settled rule in this Court that Strickland claims are "generally not entertained on direct appeal." United States v. McLaughlin, 386 F.3d 547, 555 (3d Cir. 2004) (citing United States v. Headley, 923 F.2d 1079, 1083 (3d Cir. 1991)); see also United States v. Chorin, 322 F.3d 274, 282 n.4 (3d Cir. 2003) ("[T]his Court has expressed a preference that ineffective assistance of trial counsel claims be brought as collateral challenges . . . rather than . . . on direct appeal . . . ."). "Where a claim of ineffective assistance of counsel is based on attorney incompetence, the lack of a fully developed record often precludes a comprehensive inquiry into the elements of strategy or tactics that may have entered into defense counsel's challenged decision."  McLaughlin, 386 F.3d at 555.  The Appellate Division dismissed Lewis's Strickland claims on this basis.  App. R. Invoking a narrow exception to the general rule, Lewis argues that the present "record is sufficient to allow [a] determination of ineffective assistance of counsel, [and thus] an evidentiary hearing to develop the facts is not needed."  Headley, 923 F.2d at 1083.

With respect to the first Strickland claim (based on counsel's failure to request a justification instruction), we agree with Lewis that the record is sufficient to adjudicate the claim at this time.  We disagree, however, that the claim has any merit. Given our analysis above, the claim fails as a matter of law because counsel cannot be ineffective for failing to request an instruction to which Lewis was not entitled.  See Thomas v. Horn, 570 F.3d 105, 121 n.7 (3d Cir. 2009) (holding that counsel was not ineffective in failing to object as there was no reason to object); Parrish v. Fulcomer, 150 F.3d 326, 328-29 (3d Cir. 1998) (noting counsel's assistance "does not become ineffective by failing to raise an issue when convincing Supreme Court case law shows it to be without merit").  Accordingly, we reject – on the merits and with prejudice – Lewis's first Strickland claim.

With respect to the second Strickland claim (counsel's

failure to object to the Government's references to Lewis's nickname and possession of a knife), we conclude that the appellate record is inadequate to adjudicate the claim. Aside from his <u>ipse dixit</u> that counsel's relevant deficiencies were clear in light of the proceedings, Lewis does not explain why or how the record in this case differs from the ordinary appellate record, and we decline to depart from our standard practice. Accordingly, we will affirm the Appellate Division's order dismissing Lewis's second <u>Strickland</u> claim. The dismissal shall be without prejudice to Lewis's ability to assert it in a collateral proceeding. We express no view as to the merits of that claim.

IV.

For the foregoing reasons, we will affirm the order of the Appellate Division.