# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 5, 2020

Lyle W. Cayce
Clerk

No. 19-10168

United States of America,

*Plaintiff — Appellee*,

*versus*

Alvin Christopher Penn,

*Defendant — Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:17-CR-506-1

Before Stewart, Clement, and Costa, *Circuit Judges*.
Edith Brown Clement, *Circuit Judge*:

Alvin Penn engaged in a shootout with a rival and then fled, crashing his car and tossing the gun a few minutes later. A jury convicted Penn of being a felon in possession of a firearm. At sentencing, the district court ordered Penn to pay restitution for property damaged during the melee. Penn argues that his brief possession of the gun was justified and the district court erred by not letting him present that defense to the jury. He also challenges the district court's authority to order him to pay restitution for losses that weren't caused by his possession of the gun. We reverse the district court's restitution order but otherwise affirm Penn's conviction and sentence.

No. 19-10168

## I.

On the morning of July 6, 2017, Alvin Penn was serving out the remainder of a federal sentence at a halfway house. He left and was supposed to be on his way to work, but he went to his girlfriend's house instead. After spending the morning with his girlfriend, Penn asked her to drop him off at his family's apartment because his aunt, Carmela Harris, was cooking lunch for him. When Penn arrived at the entrance of the apartment complex, he saw Devante Scott and one of Scott's associates, Kareem Robinson, standing by a car in the parking lot yelling at someone.

Scott had a history with Penn's family. He fathered two children with one of Penn's cousins, Keuna Hancock, who lived at the apartment. Another one of Penn's cousins, Demodrick Anderson, allegedly witnessed Scott murder a man. Anderson told his family about what he witnessed and began to distance himself from Scott, which is when the tension between Scott and Penn's family began. Anderson was murdered a few months later, and Penn's family believed that Scott was involved. Scott also allegedly threatened to kill Penn. So Scott was not welcome at the apartment.

Penn's girlfriend stopped the car about twenty yards away from Scott and Robinson, and Penn got out to see what they were doing there. Penn's aunt screamed, "They got a gun." Scott then pulled a gun from his pocket. Penn told Scott to put the gun down and fight, so Scott put the gun on the roof of his car. While Penn and Scott argued, Robinson picked up Scott's gun, crouched behind the car, and said "I got him." Fearing for Penn's safety, Penn's aunt rushed over to him and handed him her gun. Penn's girlfriend ran for cover at that point. Moments later, Penn opened fire.

A shootout ensued. After Penn and Robinson exchanged fire, Penn got into the driver's seat of his girlfriend's car and fled. Scott and Robinson chased after him; Scott drove while Robinson continued to shoot at Penn

from the passenger-side window. As Penn exited the parking lot, he turned right onto a highway. Scott and Robinson followed. After making another turn, Penn drove through a residential neighborhood and "ended up losing" Scott and Robinson there. Once Scott and Robinson were no longer behind him, Penn returned to the highway and stopped at an intersection.

While Penn was waiting at the light, Oscar Garcia, an officer responding to the scene of the gunfight, noticed that Penn's car matched the description of one of the suspect vehicles. Garcia began following Penn. Although Garcia didn't have his lights or sirens on, Penn looked in his rear-view mirror and realized that a police officer was behind him. Garcia continued to follow directly behind Penn as he cut across a parking lot to another street. Penn admitted that he could have pulled over to talk to Garcia, but he didn't pull over because he was a convicted felon with a gun in the car. Last time Penn was arrested, he was allegedly beaten by officers. Penn "didn't want to go back" to jail, "get caught with that gun," or "get beat[en] again," so he decided to try to evade Garcia.

Penn took a sharp left turn in front of cars, and when he saw that Garcia had gotten caught in traffic, he sped up and turned into a neighborhood. Garcia activated his lights and gave chase. Penn began to lose control of his vehicle while running stop signs and accelerating rapidly through the neighborhood. He eventually hit a curb, ran through a wrought-iron fence, and crashed into an apartment building. Penn then jumped out of the car and grabbed the gun. After unsuccessfully trying to scale a fence behind the apartment building, Penn tossed the gun over the fence into a field and took off running. The entire chase—from the time Penn first saw Garcia until he wrecked his car and ditched the gun—lasted around five minutes.

Garcia never caught Penn. When he arrived about a minute later, Penn was gone. Penn remained on the run until his arrest nearly a month later.

No. 19-10168

Penn was charged with two federal crimes: escape from federal custody in violation of 18 U.S.C. §§ 751(a) and 4082(a), and possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Penn moved to dismiss the felon-in-possession charge on the basis that § 922(g) is unconstitutional, but the district court denied Penn's motion. Aside from that, Penn didn't seriously contest the elements of his offenses. Instead, he went to trial primarily to raise an affirmative defense: he argued that he was justified in briefly possessing the gun to defend himself against Scott and Robinson. But the district court didn't allow Penn to present that defense because Penn held on to the gun longer than necessary.

The jury found Penn guilty on both counts. The district court sentenced him to 168 months' imprisonment, followed by three years of supervised release. The district court also ordered Penn to pay restitution to two victims: first, the owner of a car that was struck by a bullet during the shootout between Penn and Robinson; and second, the owner of the apartment building and wrought-iron fence that Penn crashed into during the police chase. Penn timely appealed.[1]

## II.

Penn raises four issues on appeal: *first*, that the district court erred by refusing to instruct the jury on his justification defense; *second*, that the district court erred by excluding evidence related to that defense; *third*, that the order of restitution for losses not caused by his possession of the firearm was illegal; and *fourth*, that his conviction must be vacated because the interstate-commerce element of § 922(g) is unconstitutional. We address each issue in turn.

---

[1] On appeal, Penn challenges his conviction and sentence only for the felon-in-possession charge; he does not challenge his escape conviction or sentence.

A.

First, Penn challenges the district court's refusal to submit a jury instruction on the justification defense. We review de novo a district court's refusal to provide an instruction on a defense that, if believed, would preclude a guilty verdict. *United States v. Theagene*, 565 F.3d 911, 917 (5th Cir. 2009). A criminal defendant is entitled to an instruction on a defense only if he presents sufficient evidence "for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). The defendant must produce evidence to sustain a finding on each element of the defense "before it may be presented to the jury." *United States v. Posada-Rios*, 158 F.3d 832, 873 (5th Cir. 1998). In determining whether the defendant has made this threshold showing, "we construe the evidence and make inferences in the light most favorable to the defendant." *Theagene*, 565 F.3d at 918.

We have recognized "justification" as a defense to a felon-in-possession charge. *See United States v. Harper*, 802 F.2d 115, 117 (5th Cir. 1986).[2] To establish that defense, a defendant must show that (1) he was under an imminent threat of death or serious injury; (2) he did not "recklessly or negligently" place himself in a situation where he would be forced to possess a firearm; (3) he had no "reasonable, legal alternative" to possessing the firearm; and (4) "a direct causal relationship" could be anticipated between possession of the firearm and abatement of the threat. *Id.* (quoting *United States v. Gant*, 691 F.2d 1159, 1162–63 (5th Cir. 1982)).

---

[2] "The proper name of this defense has . . . not been established." *Harper*, 802 F.2d at 117 n.1. Courts have referred to the defense using the terms "necessity," "duress," and "self-defense" interchangeably and often lump those terms together under the general rubric of "justification." *Id.*; *United States v. Leahy*, 473 F.3d 401, 406 (1st Cir. 2007). For simplicity, we refer to Penn's defense as justification.

The defendant must also prove a fifth element: that he possessed the firearm only during the time of danger. *See Gant*, 691 F.2d at 1163 n.9.

In the felon-in-possession context, courts construe the justification defense "very narrowly" and limit its application to the "rarest of occasions." *E.g.*, *United States v. Perrin*, 45 F.3d 869, 874–75 (4th Cir. 1995). The defense is often unavailable unless the defendant did nothing more than disarm someone "in the heat of a dangerous moment," and possess a gun briefly "to prevent injury to himself or to another." *United States v. Mahalick*, 498 F.3d 475, 479 (7th Cir. 2007) (citation omitted).

We have found sufficient evidence for an instruction on the justification defense only once. In *United States v. Panter*, 688 F.2d 268 (5th Cir. 1982), Lester Panter was tending bar when he was assaulted by a drunk patron. *Id.* at 269. After threatening to kill Panter, the patron pulled a knife and stabbed him in the abdomen. *Id.* Panter reached beneath the bar for a club, but his hand fell fortuitously on a pistol. *Id.* He shot the patron and then immediately placed the gun on the bar. *Id.* We held that Panter could raise the defense because he presented evidence showing that he reacted out of a reasonable fear for his life, in a conflict that he didn't provoke, and possessed the gun only for the short time necessary to defend himself. *Id.* at 270–72.

The few cases in which our sister circuits have held that a justification instruction was required are similarly extraordinary. *See, e.g.*, *United States v. Paolello*, 951 F.2d 537, 539–43 (3rd Cir. 1991) (holding justification defense available when defendant knocked a gun out of an attacker's hand, ran away with the gun, and then dropped it when police ordered him to stop); *United States v. Newcomb*, 6 F.3d 1129, 1137–38 (6th Cir. 1993) (holding justification defense available when defendant disarmed a dangerous individual in an "emergency situation that unfolded rapidly" and possessed ammunition for only "a few minutes" before police arrived).

No. 19-10168

The district court held that the justification defense was unavailable because Penn failed to present sufficient evidence that he possessed the gun "no longer than absolutely necessary." Penn argues that the district court's formulation of the fifth element was too strict. Under our precedent, Penn says, he need only show that he didn't possess the gun for "any significant period" after the alleged necessity. *Panter*, 688 F.2d at 272.

Penn misreads our precedent. To be sure, possession "before the danger or for any significant period after it remains a violation." *Id.* But the converse is not true. We've never held that the defense applies when a defendant maintains possession for only a brief period after the danger. Instead, we've emphasized that the defense protects a defendant "only for possession during the time" that the emergency exists. *Id.* If the defendant "kept the gun beyond [that] time," the defense is unavailable. *Id.* at 270–72; *accord Gant*, 691 F.2d at 1163 n.9.[3]

A defendant must act promptly to rid himself of the firearm once the circumstances giving rise to the justification subside. There is no bright-line rule that the defendant must turn the gun over to the police. *See Panter*, 688 F.2d at 269. But when "a police officer happens to find the defendant first, . . . the officer's presence gives the defendant an immediate chance to give up possession." *United States v. Moore*, 733 F.3d 171, 174 (6th Cir. 2013). A defendant can't assert a justification defense if he "fails to take advantage

---

[3] Many circuit courts require, like the district court required here, a showing that the defendant did not maintain possession of the firearm "longer than absolutely necessary." *See, e.g.*, *United States v. White*, 552 F.3d 240, 247 (2d Cir. 2009); *Paolello*, 951 F.2d at 542; *United States v. Singleton*, 902 F.2d 471, 473 (6th Cir. 1990). Other courts require proof that the defendant "relinquish[ed] the gun at the 'earliest possible opportunity.'" *United States v. Butler*, 485 F.3d 569, 573 (10th Cir. 2007) (quoting *United States v. Bailey*, 444 U.S. 394, 415 (1980)). We need not determine whether there is any difference between these formulations and what our precedent requires. Regardless of how we phrase it, Penn failed to make the minimum showing on the fifth element.

of that chance." *Id.*; *see also Paolello*, 951 F.2d at 542 (explaining that if the defendant ran from the police, then he "had an opportunity to dispose of the gun . . . earlier than he did"); *United States v. Hammons*, 566 F.2d 1301, 1302–04 (5th Cir.) (holding that a defendant who retained possession of a gun for only ten minutes couldn't raise a justification defense because he made no attempt to get rid of the gun until police arrived and "tried to conceal the [gun] from the officers"), *vacated on other grounds*, 439 U.S. 810 (1978).

We have little difficulty holding that Penn's effort to evade arrest and hide the firearm from police negates any possible satisfaction of the fifth element. Penn admitted that he fled because he didn't want to go back to jail. Garcia and Penn testified that no other cars were near them, so Scott and Robinson were no longer chasing Penn. By the time Penn saw Garcia, then, any imminent threat to Penn's safety was gone.[4] Thus, Penn's continued possession of the gun was prompted not by reasonable fear for his life but by a desire to avoid jail time.

It makes no difference if Penn kept the gun only five minutes longer than necessary. That period might have been brief, but it wasn't insignificant. Penn passed up several chances to give up the gun. He chose not to pull over and explain the situation to Garcia. He also chose not to leave the gun at the scene of the wreck; he took it with him and threw it into a field where it would be harder for police to find. "Far from evincing a 'single-minded effort' to divest himself of the gun safely, return it to law enforcement officers, or even to report to authorities the circumstances necessitating his possession of it,"

---

[4] We reject Penn's argument that his continued possession was justified by his fear of police, based on the beating officers allegedly gave him years earlier. Even if Penn's generalized fear of police could satisfy the immediate-threat requirement, the question is whether that threat justified Penn's *possession of the gun*, not his failure to pull over. Penn didn't need a gun to flee from the police. So Penn cannot show that he could have avoided the threatened harm only by possessing the firearm. *See Gant*, 691 F.2d at 1164.

Penn's testimony shows just the opposite: a surreptitious effort to conceal his role in the shootout and unlawful firearm possession from the police. *Virgin Islands v. Lewis*, 620 F.3d 359, 370 (3d Cir. 2010).

On these facts, no reasonable jury could find that Penn possessed the firearm "only . . . during the time he [was] endangered." *Panter*, 688 F.2d at 272. We therefore hold that Penn failed to present sufficient evidence on the fifth element of his justification defense. For that reason, the district court properly refused to instruct the jury on the defense.

## B.

Second, Penn contends the district court erred by excluding evidence of Scott's prior violent acts and threats against Penn's family. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Daniels*, 930 F.3d 393, 404 (5th Cir. 2019). Even if the district court abused its discretion in excluding evidence, we will not vacate a conviction unless the error was harmful, meaning it affected a "substantial right" of the defendant. *Id.* The question "is whether the trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence inserted." *United States v. Willett*, 751 F.3d 335, 343 (5th Cir. 2014) (quoting *United States v. Wen Chyu Liu*, 716 F.3d 159, 169 (5th Cir. 2013)).

The evidence at issue pertains to Penn's defense of justification. Because Penn failed to make the threshold showing required to present that defense, the evidence was irrelevant. *See Bailey*, 444 U.S. at 416 (holding that if a defendant fails to support one element of a defense, "the trial court and jury need not be burdened with testimony supporting other elements"); *United States v. Ragsdale*, 426 F.3d 765, 778 (5th Cir. 2005) (concluding that evidence offered to support an unavailable defense is irrelevant). Thus, the district court did not abuse its discretion by excluding that evidence.

No. 19-10168

Penn asserts that even if the justification defense was unavailable, the district court should have allowed him to tell "his side of the story." For instance, the government asked Penn's aunt if it was fair to say she didn't like Scott. Rather than object to that line of questioning, Penn's counsel sought permission to ask Penn's aunt *why* she didn't like him. The government argued that the reason was "completely irrelevant." The court didn't allow Penn's counsel to ask that question, but the court warned the government that it was coming "dangerously close to opening the door."

Even if the district court abused its discretion by excluding evidence about Scott, that error was harmless. The excluded evidence had no bearing on any element of the charged offenses. Penn's argument that this evidence "would have informed the jury's moral judgment," suggests that the evidence would only inspire jury nullification. "Evidence admitted solely to encourage nullification is by definition irrelevant, and thus inadmissible, regardless of what other evidence might be introduced at trial." *United States v. Manzano*, 945 F.3d 616, 630 (2d Cir. 2019).

## C.

Third, Penn contends that the district court lacked authority to order restitution for damages that occurred during the shootout and police chase because those losses weren't caused by his felon-in-possession conviction. A district court can order restitution only "when authorized by statute." *United States v. Espinoza*, 677 F.3d 730, 732 (5th Cir. 2012) (quoting *United States v. Love*, 431 F.3d 477, 479 (5th Cir. 2005)). Because a restitution order that exceeds the court's statutory authority is an illegal sentence, which always constitutes plain error, we review de novo the legality of a restitution order, regardless of whether the defendant raised this objection at sentencing. *United States v. Nolen*, 472 F.3d 362, 382 & n.52 (5th Cir. 2006); *United States v. Bevon*, 602 F. App'x 147, 151 (5th Cir. 2015) (unpublished).

No. 19-10168

The district court's judgment cited 18 U.S.C. § 3663 as the basis for restitution. Under § 3663, "a defendant convicted of an offense" may be ordered to "make restitution to any victim of such offense." *Id.* § 3663(a)(1)(A). Because that language links restitution to the offense of conviction, the Supreme Court held that the statute authorizes an award of restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990). This is known as the *Hughey* rule.

Penn argues that § 3663 did not authorize the district court's restitution order because the victims' losses were not caused by the conduct underlying his felon-in-possession conviction.[5] We agree.

The district court ordered restitution for losses suffered when someone—it could have been Penn or Robinson—fired a bullet that struck a car during the shootout and when Penn crashed into a fence during the high-speed chase. The specific conduct underlying the elements of the felon-in-possession offense does not include use of a firearm or flight from police. As a result, neither the owner of the car nor the owner of the fence is a "victim" of Penn's conviction. *See Espinoza*, 677 F.3d at 733–34 (holding loss sustained by pawn shop that bought stolen firearms from defendant was not caused by conduct underlying defendant's felon-in-possession conviction); *United States v. West*, 646 F.3d 745, 751 (10th Cir. 2011) (holding damage caused to cars and store while defendant was fleeing from police was not caused by conduct underlying defendant's felon-in-possession conviction); *United*

---

[5] The district court ordered Penn to pay restitution based on his felon-in-possession conviction. That offense requires proof that (1) the defendant knowingly possessed a firearm; (2) before possessing that firearm, the defendant had been convicted of a felony; and (3) before the defendant possessed the firearm, it traveled in and affected interstate commerce. *United States v. Ortiz*, 927 F.3d 868, 874 (5th Cir. 2019).

*States v. Reed*, 80 F.3d 1419, 1421 (9th Cir. 1996) (holding damage caused to vehicles while defendant was fleeing from police was not caused by conduct underlying defendant's felon-in-possession conviction). Thus, § 3663 could not serve as the basis for the restitution order.

According to the government, however, the district court intended to order restitution under 18 U.S.C. § 3583(d). That statute allows a court to impose as a condition of supervised release any discretionary condition of probation found in § 3563(b), including "restitution to a victim of the offense under section 3556." *Id.* §§ 3583(d), 3563(b)(2). In turn, § 3556 provides that a court "shall order restitution in accordance with section 3663A, and may order restitution in accordance with section 3663." *Id.* § 3556. But restitution ordered as a condition of supervised release is "not subject to the limitation of section 3663(a) or 3663A(c)(1)(A)." *Id.* § 3563(b)(2).

The government argues that the inapplicable "limitation" to which § 3563(b) refers is the definition of "victim" in § 3663(a)(2), which more or less codifies the *Hughey* rule. We disagree. Sections 3663(a) and 3663A(c)(1)(A) limit restitution under those statutes to a list of enumerated offenses. *See id.* §§ 3663(a)(1)(A), 3663A(c)(1)(A). The "limitation" excluded by § 3563(b)(2) is that enumerated-crimes limitation, not the *Hughey* rule. *See Love*, 431 F.3d at 480 & n.11.

Applying the *Hughey* rule to § 3563(b)(2) makes sense. Restitution under that statute is limited to victims "of the offense," a phrase nearly identical to the one that the Court construed in *Hughey*, 495 U.S. at 413 n.1 Indeed, every circuit court that has considered this issue has held that the *Hughey* rule applies to § 3563(b)(2). *See, e.g.*, *United States v. Varrone*, 554 F.3d 327, 333–34 (2d Cir. 2009) (Sotomayor, J.); *United States v. Freeman*, 741 F.3d 426, 433–35 (4th Cir. 2014); *United States v. Batson*, 608 F.3d 630, 636–37 (9th Cir. 2010). We too have observed that restitution imposed under

§ 3563(b)(2) must be "limited to losses from the crime of conviction." *United States v. Nolen*, 523 F.3d 331, 333 (5th Cir. 2008).

In sum, restitution imposed as a condition of supervised release can compensate only for losses caused by the specific conduct that is the basis for the offense of conviction. *Hughey*, 495 U.S. at 413. For that reason, even if the district court intended to order restitution as a condition of supervised release, the court lacked authority to do so. *See Espinoza*, 677 F.3d at 733–34; *West*, 646 F.3d at 751. We thus reverse the district court's restitution order.

## D.

Fourth, Penn contends that 18 U.S.C. § 922(g), as construed, is unconstitutional. Penn preserved this issue by raising it in his motion to dismiss the indictment. We review the constitutionality of a federal statute de novo. *United States v. Portillo-Munoz*, 643 F.3d 437, 439 (5th Cir. 2011).

Section 922(g) prohibits some people from possessing a firearm "in or affecting commerce." 18 U.S.C. § 922(g). We have held that the "in or affecting commerce" element is satisfied if the firearm had "a past connection to interstate commerce." *United States v. Fitzhugh*, 984 F.2d 143, 146 (5th Cir. 1993). Under that interpretation, Penn argues, § 922(g) exceeds Congress's power under the Commerce Clause.

As Penn properly concedes, our precedent forecloses this argument. *See, e.g.*, *United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013). He contends, though, that we should reinterpret § 922(g) in light of the Supreme Court's decision in *Bond v. United States*, 572 U.S. 844 (2014). But *Bond* did not address § 922(g) or abrogate our precedent. *See United States v. Brooks*, 770 F. App'x 670, 670 (5th Cir. 2019) (unpublished). Accordingly, we are bound by our settled precedent and conclude that this issue is foreclosed.

No. 19-10168

## III.

For the foregoing reasons, we reverse the district court's restitution order and affirm Penn's conviction and sentence in all other respects.

AFFIRMED IN PART; REVERSED IN PART.