**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 13-4700

———————————

UNITED STATES OF AMERICA

v.

JUSTIN WILLIAMS,
a/k/a NEW YORK ICE,
a/k/a PIMP JUICE

Justin Williams,
                        Appellant

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 2-13-cr-00014-001)
Honorable J. Curtis Joyner, District Judge

———————————

Argued October 5, 2016

BEFORE:  SHWARTZ, GREENBERG, and ROTH, <u>Circuit</u> <u>Judges</u>

(Opinion Filed:  December 16, 2016)

———————————

Zane David Memeger
Bernadette McKeon
Michelle L. Morgan          (ARGUED)
Office of United States Attorney
615 Chestnut St., Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

Richard Coughlin
Office of Federal Public Defender
800-840 Cooper Street
Suite 350
Camden, NJ 08102

Alison Brill                    (ARGUED)
Office of Federal Public Defender
22 South Clinton Avenue
Station Plaza #4, Fourth Floor
Trenton, NJ 08609

*Counsel for Appellant*

_____

OPINION*

_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

I.    INTRODUCTION

A jury found defendant-appellant Justin Williams guilty of two counts of sex trafficking by force, fraud, or coercion under 18 U.S.C. § 1591 arising out of his role as a pimp for two women. In relevant part, that statute criminalized at the time of the offenses an individual's participation in sex trafficking "knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). The jury also convicted Williams of one count of witness tampering pursuant to 18 U.S.C. § 1512 for sending a letter to one of the sex trafficking victims directing her

_____

*This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

to recant her statements to the government about the case.

Williams appeals from his convictions claiming that there were four errors at his trial entitling him to a reversal on this appeal. First, he argues that the jury instructions erroneously failed to include the causation element of the sex trafficking offenses linking the sexual conduct to his use of force. In this regard, he contends that a special verdict form that the District Court supplied to the jury minimized the statute's focus on that element of the offenses and thereby compounded the error. Second, he challenges the sufficiency of the evidence presented at trial. Third, he claims that the District Court deprived him of his constitutional right to a complete defense by excluding evidence of a victim's prior acts of prostitution pursuant to Federal Rule of Evidence 412. Fourth, he asserts that the Court committed plain error by not sua sponte giving the jury an affirmative defense instruction on the witness tampering charge that would have shielded him from conviction if, by lawful means, he encouraged a witness to testify truthfully.

We will affirm the convictions for the following reasons.


## II. JURISDICTION

The District Court had jurisdiction in this case pursuant to 18 U.S.C. § 3231. Following the jury trial and subsequent timely appeal, we have jurisdiction under 28 U.S.C. § 1291.


## III. BACKGROUND

A. Procedural History

3

On January 10, 2013, a grand jury in the Eastern District of Pennsylvania indicted Williams on two counts of sex trafficking of two women, Talia and Erika, by force, fraud, or coercion in violation of 18 U.S.C. § 1591.[1] App. at 10. In May 2013, during Williams's incarceration, he sent a letter to Erika professing his love for her and told her to "call the lawyer[,] take back the statement and he'll protect u [sic] from the feds." Id. at 812. He additionally wrote that "[Talia] & you are their case." Id. This letter prompted the grand jury to issue a superseding indictment adding one count of witness tampering pursuant to 18 U.S.C. § 1512 to the two counts of sex trafficking. Id. at 753.

Before the trial, Williams unsuccessfully moved in limine for an order providing that evidence of Erika's prior commercial sex activity would be admitted at the trial pursuant to an exception to the basic rule in Fed. R. Evid. 412 which excludes specified evidence of a person's prior sexual activity. At the conclusion of the trial the jury found Williams guilty on all three counts of the indictment. Both prior to and after the jury returned its verdict, Williams unsuccessfully moved for a judgment of acquittal.

On January 21, 2015, the District Court sentenced Williams to a 360-month custodial term on each of Counts 1 and 2 and a 240-month custodial term on Count 3, with all terms running concurrently. Id. at 718. The sentence was within the advisory guideline range and Williams does not challenge it on this appeal. Id. The Court also imposed a 10-year supervised release term to follow execution of the custodial terms and ordered Williams to pay restitution to Talia and Erika and a special assessment. Id. at 719, 722, 738-39. Williams timely filed a notice of appeal.

---

[1] Throughout this opinion, we will refer to the women only by their first names.

B. Statement of the Facts as Presented at the Trial

At trial, the government presented evidence that Williams acted as a pimp for a number of women, a contention that Williams admitted. Three women—Talia, Erika, and a woman named Ivy whom Williams also controlled—testified about their interactions with Williams as they engaged in commercial sex acts.[2]

Erika met Williams at a casino in March 2010 and found him attractive. Id. at 284. She had been a prostitute for 12 years, and she testified that when she met Williams she wanted "to pay him" and "be with him." Id. at 286. Erika testified that she worked voluntarily for Williams until her arrest in May 2012. Id. at 285-87.

Talia also met Williams at a casino. She had moved to Philadelphia in July 2010 to live with her godfather and to attend a community college as an "opportunity to start over" after her mother found out that she had been dancing at a club in Atlanta. Id. at 123. But she started dancing again in Philadelphia, and in November 2011, when she was 20 years old, her godfather required her to leave his house. Id. at 126-27. A few days later, she met Williams at a casino. Id. at 127. She testified that he impressed her and she made the personal choice to leave with him. Id. at 125, 181-82.

After Talia travelled with Williams to New York and met two other women who also were working for Williams as prostitutes, he convinced her to do so as well. Id. at 129-31. When she originally considered his proposal, she "burst[] into tears." Williams, however, consoled her and "tried to make it seem like it was okay." Id. at 131. Talia

_____

[2] We will focus on Talia's and Erika's testimony, as they were the victims listed in Counts 1 and 2 of the indictment, and we cite Ivy's testimony only insofar as it concerns those two counts.

claimed that she never previously had been a prostitute. Id. But she had heard Williams hit Erika, and she testified, "I didn't feel like I had many options but to do what he said." Id. At that time, she provided Facebook photos of herself for use in internet advertisements. Id. at 183. Talia stated that she did not abandon her situation or call her mother for a variety of reasons: she was somewhere she never had been before; she did not know the people around her; she had been forced to leave someone's home for the second time and did not know where to go or what to do; she felt ashamed; and she did not want to tell her mother in Atlanta "like a thousand miles away" that she was in her situation. Id. at 132. She "just felt stuck." Id. She testified that she "didn't feel fully that it was [her] choice at the time" that she made the decision to become a prostitute. Id. at 191.

Talia worked for Williams for two or three months. Id. at 132. During that time, Williams took her and other women to a number of places in New York, Pennsylvania, New Jersey, Virginia, and Washington, D.C. so that they could work as prostitutes. Id. at 133-34. In Philadelphia they stayed in a crack house, which, at least at the outset, was in a filthy condition. Id. at 136. The women found clients through postings on Backpage, a website popular for solicitation, and by walking the streets. Id. at 135. Talia often created website advertisements and listed her own phone number on them. Id. at 138-42. Erika and she purchased prepaid cards with which to buy the advertisements. Id. at 144. When Talia received a call responding to an advertisement, she would tell another woman whom Williams controlled that there was a potential "date" on the phone. Id. at 188. Talia averaged 5-10 "dates" with clients each day, while Erika had 1-10 per day,

and Ivy averaged 8-9 "dates" per day. Id. at 145, 268, 353. Talia testified that Williams would be in close proximity during these "dates" and stay with them all day, although Erika denied that he did so. Id. at 133, 148, 312.

Talia, Erika, and Ivy explained Williams's rules. Id. at 132-33, 273, 352-53. Talia and Erika originally had a quota of $1000 per day, which Williams reduced to $700 or $750. Id. at 147, 273. Williams set Ivy's quota at about $500. Id. at 353. Ivy stated that she was told that she could accept only certain prices for her services and Williams directed her not to get into a car with younger men. Id. at 352. All three women testified that Williams required them to give him the money that they received from prostitution, although Talia stated that Williams allowed them to keep some money for food purchases and she acknowledged that he purchased other items for her at times. Id. at 133, 145-46, 210, 269. When they were on "dates" with clients, they could not stay for longer than 15-20 minutes without notifying Williams that they would receive additional payment for their longer stay. Id. at 133; see id. at 352-53. If they failed to update Williams, Talia testified that he would call to ask where they were and what they were doing. Id. at 146. The women needed to shower immediately upon return from a "date" and "wash the streets off." Id. at 133. The longest time that Erika worked continuously was around 18 hours, while Ivy's longest period of working without a break was 15 hours. Id. at 269, 354. But Talia once worked 25 hours straight. Id. at 147. Williams did not give them regular time off from work, but he would not send them out to work if he was in a good mood. Id. at 147.

7

Talia and Erika witnessed Williams's violent behavior towards the women who worked for him. Talia testified that when she first was with Williams she heard him hit Erika and that she saw Williams hit Erika at least once every two weeks thereafter. Id. at 150. Talia stated that Williams would punch Erika in the face and middle of the chest with a closed fist when she "talked back." Id. at 150-51. Erika also testified that she saw Williams engaging in other acts of violence. Id. at 255-56. She testified that she watched him slap two different women. Id. at 255. Erika also observed Williams slap, punch, and kick another woman under his control named Stevi. Id. at 258. He sent Talia and Erika out to work the streets after beating Stevi in front of them. Id.

The women detailed Williams's violence against them. Talia testified about a time when she made a comment to one of Williams's associates and Williams interjected that he would "punch the glasses like off of [her] face for talking to him." Id. at 159. Ivy acknowledged that Williams punched her in the stomach in front of Talia. Id. at 357. Talia claimed that Williams used violence and threats as "his main mode of, you know, trying to keep [them] together, doing what he told [them] to do." Id. at 158.

Of all the women under his control, Williams most frequently was violent toward Erika, id. at 259. In this regard, Ivy and Erika agreed that Erika bore the brunt of Williams's violence. Id. at 259, 363. Erika explained that Williams sometimes was violent toward her on a weekly basis, but that at other times he could go for months without subjecting her to violent acts. Id. at 250. Williams would slap her, punch her in the ribs and face with his fist, kick her, and shove her, sometimes in front of the other women working for him. Id. at 250-54. Ivy watched Williams punch Erika in the face

8

and stomach and grab her by her neck and head. Id. at 350-51. She said that she witnessed that type of violence about ten times, and that she noticed that Erika had swollen lips, a black eye, and bruises, and was missing teeth multiple times after those incidents. Id. at 362. At times, Williams would send Erika out to engage in prostitution after those beatings. Id. at 250-54, 363. Erika's mother testified that Williams told her that he had to "physically beat [Erika] or hit her to get her straight" because she almost had "gotten them both in trouble." Furthermore, Erika's mother detailed the black eyes and bruises she had seen on Erika's body while Erika was dating Williams. Id. at 71-72. Another time, he gave Erika a deep cut on her arm with hair clippers because he attributed the incarceration of a friend of his to her actions. Id. at 252-53. In a recorded call offered as evidence, Williams told Erika, "I got to come over there and put a slave trader over top of you to do anything." Id. at 275. Erika testified that this meant he was going to send one of his friends to be with her. Id.

Talia described a time when Williams acted violently toward Erika, Talia, and Stevi after the women told Williams about a prospective client who was acting strangely. Id. at 152. They mentioned to Williams that the prospective client was "acting like kind of boyfriend-ish." Id. In response Williams lined up Erika and Talia next to each other in a hallway and yelled at them, asking about the man. Id. Williams hit Erika, hit Talia in the face three times, and pushed Talia against the wall. Id. at 153-56. He brought the women into a downstairs room, where he punched Stevi in the face and body, stomped on her, kicked her, and pulled her by the hair to throw her head into the edge of the door. Id. Williams then hit Erika right below the sternum, and she fell to the ground gasping for

9

breath. Id. at 153. This incident lasted 10-15 minutes, and immediately afterward Williams sent the women back outside to continue working on the streets. Id. at 154.

Ivy and Erika detailed another incident in which Williams pulled a phone cord out of the wall and used it to whip Ivy while she was wearing a towel. Id. at 256, 358. Erika was in the room at that time but she turned her head to avoid seeing it happen. Id. at 256. She heard the sound of the cord hitting Ivy, heard Ivy screaming, and witnessed Ivy crying afterward. Id. at 257. Ivy asserted that Williams hit her with the cord because she had been kidnapped and when she returned he told her that she would "have to pay for it." Id. at 358. Ivy testified that a few days after she returned from the kidnapping, he told her that "he would beat [her] with a phone cord, and that's exactly what he did." Id. Ivy showed the jury many marks on her body from the incident. Id. at 361. One of those marks was five inches long, while another on her torso had been "split open" and looked as if it was still swollen. Id. at 361. Erika denied during her second day of testimony that this incident had happened. Id. at 314.

Williams was incarcerated in December 2011. Id. at 161. In telephone calls from jail, Williams continued to direct the women's work and told them to meet their quotas. Id. at 165-66. Talia and Erika continued working for him while he was incarcerated on an unrelated charge, helped him find a defense lawyer, and used the money from their acts of prostitution to meet his bail. Id. at 163, 214, 273. Talia also visited him and told him that she loved him. Id. at 163. Williams promised Talia to take her to Las Vegas once he was released, although he never did so. Id. at 167. Talia told him that she

10

wanted to leave while he was incarcerated but stated that "[h]e kind of coerced [her] not to," telling her that she "would lose [her] protection." Id. at 168.

While Williams was incarcerated, the police questioned Talia and Erika. Id. at 162. The women told the police that Williams was Erika's boyfriend and declined to mention that he was physically abusive. Id. at 162, 272. Talia lied to the police about whether he was forcing her to commit acts of prostitution and whether she was giving him money. Id. at 167, 216. She testified that she lied to the police because, "when [she] first got there, [she] felt like [she] didn't have anywhere to go, and at this point [she] really didn't feel like [she] had anywhere to go." Id. at 162. She stated that "[a]t that point [she] felt like the consequences of ratting out [Williams] and then getting out later would be worse than lying to the police." Id.

After Williams was released from jail, he hit Talia three times in the face. Id. at 205. He was reincarcerated in January 2012, and Talia continued to try to help him to get released. Id. at 217-18. Talia testified that when Williams told her that he was going to be released, she was happy about it. Id. at 220.

Talia was arrested twice for prostitution while working for Williams. Id. at 206. She eventually left Williams when her mother came to Philadelphia for Talia's court date on a prostitution charge. Id. at 168-70. She went home with her mother and never worked for Williams again. Id. at 170. Talia testified that she finally decided to leave because her mother and sister were present and she knew it was her chance to do so. Id. at 175. She asserted that she had wanted to leave before, but "was scared and didn't for a lot of reasons." Id. She later talked on the phone to Williams, who told her he still loved

11

her and asked her why she left.  Id. at 170.  After that, Williams sent Talia a text message telling her he loved her, wanted her to return, and would send her money.  Id. at 172.

On cross-examination, Erika acknowledged that she still loved Williams, had his name in her phone as "Sexy," and was excited for him to be released from jail.  Id. at 292, 306.  She said that she engaged in prostitution because of her love for Williams and her desire to pay him.  Id. at 292.  She said that their relationship was an "interchange of benefits" and that Williams's violent conduct did not motivate her to engage in prostitution.  Id. at 293, 299.  She claimed that she had testified earlier that Williams hit her and Talia because the federal government had threatened her.  Id. at 308, 317.  She denied that Williams ever used force, threats of force, or coercion to induce her to commit commercial sex acts.  Id. at 308.  She also said that she was not insecure around Williams and that he never had placed her in danger or caused her serious harm.  Id. at 308.

Williams testified at the trial.  In his version of events, the women asked him to get involved with him in their acts of prostitution.  Id. at 507.  He apologized for accepting money from the women, but contended that he was their security and that they enjoyed the "fun" they had with him.  Id. at 455-58, 508.  Williams claimed that the women cared for him.  Id. at 459.  He also contradicted their testimony that they received little from him, stating that the "women eat big lobsters.  They wear Louis Vuitton shoes.  They buy bags that cost $1,000."  Id. at 453.  Williams testified that he is "pushy" and has "a big mouth" but does not "bite at all" and denied that he had ever hit, punched, shoved, or kicked the women.  Id. at 456, 492.  Williams claimed that he never had met

12

Ivy, asserting that he did not "know [Ivy] from a can of water" or "a can of beans." Id. at 451, 480. When commenting on recorded evidence in which he sounded angry, he acknowledged that he sounded "hurtful" but explained that he was like a teacher with an out-of-control classroom: he needed to be forceful because he was responsible for the women and they would have gotten hurt without his guidance. Id. at 460. He claimed that his testimony differed from the women's because they "were under pressure from the government" to lie. Id. at 485. Williams also contended that the federal government had threatened Erika and that he intended in his letter to her to encourage her to testify truthfully. Id. at 463-64. After considering the testimony that we partially, but nevertheless at great length, have described, the jury found Williams guilty on all three counts. Id. at 788-91.

IV. DISCUSSION

A. The Appropriateness of the District Court's Jury Instructions

Williams contends that the District Court committed reversible error in its use of a four-element test that separated the statutory language concerning acts of force, fraud, or coercion from the element of the sex offenses concerning causation in 18 U.S.C. § 1591. Id. at 616-17. He argues that the District Court's description of the elements in that manner constructively amended the indictment because the description allowed the jury to convict Williams for using force, threats of force, fraud, or coercion against a person who engaged in commercial sex acts even if his actions did not the cause that person to engage in those sex acts. These instructions, so Williams's argument goes, required the

13

jury to convict him, if it found (1) that he used threats of force, force, fraud, or coercion against someone even if these wrongful acts did not cause that person to engage in a commercial sex act—e.g., in a situation of domestic abuse—and (2) that a person was caused to engage in a commercial sex act for any other reason—such as for love or profit.[3] This language, he maintains, is broader than both the indictment and the statute, so his convictions on the sex trafficking counts should be reversed.

1. The Standard of Review

The parties dispute whether Williams properly raised and preserved his objection to the jury instructions, and thus whether the harmless error or plain error standard of review applies in our review of this issue. If an objection is raised and preserved for appeal and the appellant establishes that there was trial error the burden shifts to the prosecutor to demonstrate that the error was harmless. On the other hand, if a defendant does not preserve the issue for appeal by objecting at trial, he has the burden to establish on appeal that the error meets exacting requirements to show that the error was plain entitling him to relief on appeal. United States v. Russell, 134 F.3d 171, 178 (3d Cir. 1998).

Federal Rule of Criminal Procedure 30(d) requires a party to object to jury instructions before the jury retires to deliberate, and at that time provide the court with the specific objection and the grounds for the objection. When a defendant makes a

---

[3] Williams in his testimony summed up this legal argument succinctly: "I thought this charge was sex trafficking by force, meaning like the people – when they bring people from Russia and put them in the basement and make them see a person and put them back down there. That's what I thought was going on, not the fact that whoever hits a prostitute gets 15 years." App. at 450.

timely, but unsuccessful, objection to a jury instruction, an appellate court will exercise plenary review in considering the objection.  United States v. Waller, 654 F.3d 430, 434 (3d Cir. 2011).  If the court finds that there were defects in the jury instructions rising to a constitutional level, it will review the instructions to determine if the error was harmless. Id.

A defendant's failure to make a timely objection to a jury instruction prevents the appellate court from conducting a harmless error review.  Fed. R. Crim. P. 30.  Instead, the more demanding standard in Federal Rule of Criminal Procedure 52(b), which permits courts to consider a plain error that affects substantial rights even when a party failed to raise the issue at trial, must be applied.  See United States v. Antico, 275 F.3d 245, 265 (3d Cir. 2001), abrogated on other grounds by Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896  (2010).  We have held that "[a]n error is plain if it is clear or obvious under current law."  United States v. Tann, 577 F.3d 533, 537 (3d Cir. 2009) (internal quotation marks omitted).  The error affects substantial rights when it "cause[s] the defendant prejudice, in that it affect[s] the outcome of the district court proceedings." Id. at 538 (internal quotation marks omitted).  The defendant bears the burden of making a "specific showing of prejudice" under this rule.  Id.  With respect to granting relief the rule is "permissive, not mandatory."  United States v. Olano, 507 U.S. 725, 735, 113 S.Ct. 1770, 1778 (1993).  An appellate court may take remedial action if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392 (1936).  In determining whether there has been a plain error in jury instructions, a court will "consider the totality

15

of the instructions . . . , not focusing on a particular paragraph in isolation." United States v. Kukafka, 478 F.3d 531, 539 (3d Cir. 2007) (citing United States v. Coyle, 63 F.3d 1239, 1245 (3d Cir. 1995)).

A mere request for an instruction is not an objection even if the court does not give the instruction as such a standard would burden the district court with "speculat[ing] on what sorts of objections might be implied through a request for an instruction and issu[ing] rulings on 'implied' objections that a defendant never intends to raise." Jones v. United States, 527 U.S. 373, 388, 119 S.Ct. 2090, 2101 (1999). We, however, do not mandate the use of special language to preserve an objection. United States v. Currens, 290 F.2d 751, 759 (3d Cir. 1961) (stating that the appellate court should not take a "wooden[]" approach to determining whether objections were preserved); see 2A Charles Alan Wright & Peter J. Henning, Federal Practice & Procedure Federal Rules of Criminal Procedure § 484 (4th ed. 2009). The objection must be clear enough that "a trial court [may] correct any instructional mistakes before the jury retires." Jones, 527 U.S. at 387-88, 119 S.Ct. at 2101. This requirement "help[s] to avoid the burdens of an unnecessary retrial." Id. at 388.

Williams claims that our holding in Russell, 134 F.3d 171, should guide our review of his counsel's approach to the jury instructions. In that case, we held that the defendant's counsel preserved an objection to the jury instructions even though he failed to state specifically that he objected to them. Id. at 178. But in Russell there had been a conference in the district court about those instructions that alerted the court to the counsel's argument that the instructions failed to comply with one of our prior decisions.

16

Id. The court responded that it would review that argument. Id. at 179. We held that the

court's response showed that it recognized that the argument was an objection. Id.

Accordingly, Russell is inapposite, as Williams's counsel did not give an indication

similar to that the defense counsel gave in Russell that would have put the District Court

on notice that Williams was objecting to the instructions.

In the present case, Williams's counsel did not preserve the objection to the lack

of causation in the elements of the offense. While he objected along those lines during

the discussion of the special verdict form that the District Court sent to the jury, he did

not raise that argument again when discussing the jury instructions detailing the elements

of the offense. App. at 515-21. Moreover, before instructing the jury the Court asked the

parties if they had any objections to Williams's proposed jury instructions detailing the

elements of the offense. Id. at 519. The government at that time responded that its

proposed jury instructions included four elements rather three elements as Williams

proposed. Id. at 520. Williams's counsel stated that he "forgot to include the

component" of "the financial aspect" of the offense.[4] Id. The following exchange then

ensued:

> The Court: And I will give the government's points for charge with the four
> elements in it.
> [Counsel for Williams]: With that fourth element of the financial. That's fine.
> The Court: Okay. So you withdraw your three and accept her four?
> [Counsel for Williams]: And I understand that the other three that I included –
> The Court: Are included within the charge.

[4] Williams argues that his counsel was mistaken, as he had not forgotten the "financial aspect." Appellant's reply br. at 1. While that may be true, the counsel's mistake concerning his proposed jury instructions failed to put the District Court on notice that Williams objected to the charge on the causation issue.

17

[Counsel for Williams]: Yes.
The Court: Very well.

Id. at 520.

Even if Williams's counsel understood this exchange to mean that the District Court would use his proposed jury instructions on the force and causation elements, thereby nullifying any need to object on that issue, this exchange did not put the District Court on notice of his current objection to the Government's proposed instructions. Thus, once Williams's counsel later learned that the District Court would not use his exact formulation, to preserve his objection he was required to object on the grounds that he now raises and he was given the opportunity to do so. After the District Court finished reading the instructions to the jury, it gave Williams's counsel another opportunity to object as it asked the parties, "[I]s there anything else you want me to include in this instruction, or anything that I might have misstated that I should correct before I send the jury out?" Id. at 625. Inasmuch as Williams's counsel did not object to the four-element test on the basis that he advances on this appeal, id., the Court could not have been on notice of that objection, particularly inasmuch as Williams's counsel explicitly indicated his satisfaction with the instructions. Hence we review the jury instructions for plain error.

2. The Jury Instructions and the Verdict Form

Williams claims on this appeal that the jury instructions constructively amended the indictment by broadening the "possible bases for conviction from that which appeared in the indictment." Appellant's br. at 29 (quoting United States v. Lee, 359 F.3d 194, 208 (3d Cir. 2004)). He argues that the instructions impermissibly omitted the causal link that

18

18 U.S.C. § 1591 requires between force, fraud, or coercion and the commercial sex act. Id. at 29-32. He therefore argues that the instructions allowed the jury to convict him for using force or coercion, and, separately, causing the women to engage in commercial sex acts, perhaps voluntarily, and thus not requiring the jury to find, as the statute requires, that he used force to cause the women to engage in commercial sex acts. Id. Though, as we have stated, in a plain error analysis, the defendant bears the burden of demonstrating prejudice, a constructive amendment of an indictment creates a rebuttable presumption of prejudice. United States v. Syme, 276 F.3d 131, 154 (3d Cir. 2002).

At the time of the offense,[5] the relevant part of the sex trafficking statute involved here, 18 U.S.C. § 1591 (2008), provided that:

(a) Whoever knowingly –

(1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, . . . shall be punished . . . .

To violate this statute, a perpetrator must know or recklessly disregard that "means of force, threats of force, fraud, coercion, . . . or any combination . . . will be used to cause the person to engage in a commercial sex act." Id. (emphasis added). The statute defines "coercion" as

---

[5] The statute was amended after Williams committed his offenses but we are not concerned with the amendments.

(A) threats of serious harm to or physical restraint against any person;

(B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

(C) the abuse or threatened abuse of law or the legal process.

Id. § 1591(e)(2). The statute defines "serious harm" as used in the definition of "coercion" to mean "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." Id. § 1591(e)(4).

The District Court provided the following instructions to the jury: "The second element of each of these Counts . . . is that 'the defendant knew or recklessly disregarded the fact that force, threats of force, fraud, or coercion <u>would be used</u> with respect to this person. . . . Third, 'that the defendant knew or was in reckless disregard of the fact that this person <u>would be caused</u> to engage in a commercial sex act.'" App. at 616-17 (emphasis added).

Williams makes a plausible argument that, in an interpretation of these two statements in isolation, "would be caused" is not directly linked with force, fraud, or coercion.[6] But we hold that, viewing the jury instructions as a whole, the District Court

_____

[6] 18 U.S.C. § 1591 does not require that there be a direct temporal nexus between the threats, force, fraud, or coercion and the commercial sex act although the closer the coercive conduct is to the acts of prostitution, the more likely the causation element of the offense will be satisfied. Accordingly, a person may be guilty under the statute for

20

did not commit plain error or error at all in giving the instructions.[7] As the jurors examined the verdict forms, the Court informed them that "Count 1 charges both sex trafficking by force, and also the attempted sex trafficking. . . ." Id. at 604. The Court told the jurors that the indictment alleged that Williams committed "the offense of sex trafficking of [sic] force by [sic] Person 1" and connected that to the jury verdict slip, stating that "you are to first make a determination as to whether or not the government has proven him guilty of sex trafficking by force of Person 1." Id. at 605. The verdict form stated that Count 1 was "[s]ex trafficking by force of Person 1." Id. at 788. The portion of the verdict form describing the elements of attempt also used the term "sex trafficking by force." Id. at 789. The same applied to Count 2. Id. at 789-90. The Court read those parts of the verdict form to the jurors. Id. at 607-610.

Furthermore, contrary to Williams's assertion that the District Court told jurors not to pay attention to the indictment, the Court alerted the jurors to its exact terms. Id. at 612. The Court told the jury that Williams was charged with two counts of "sex trafficking by force" and read the statutory language included in the indictment: "that

___

knowingly creating a pattern of behavior that coerces a victim into committing commercial sex acts. See United States v. Todd, 627 F.3d 329, 331-34 (9th Cir. 2009), as amended Nov. 15, 2010 (stating that "[w]hat the statute means to describe, and does describe awkwardly, is a state of mind in which the knower is familiar with a pattern of conduct" and upholding a conviction when the defendant imposed rules about daily earnings and requested that they be given to him, the victim testified that she believed the defendant would beat her if she kept any earnings from him, the defendant beat a woman in front of the victim, and the defendant beat the victim for violating the rules).

[7] We agree with both parties that the defense instruction was "a bit clearer" by eliminating the passive voice in the third element. Appellee's br. at 28.

21

means a [sic] force, threat of force, fraud or coercion, or any combination of such means, will be used to cause the person to engage in a commercial sex act . . . ." Id. at 613-14.

The District Court recapitulated that "it is a federal crime for anyone in or affecting commerce" to engage in a number of activities "knowingly or in reckless disregard of the facts that means of force, threat of force, fraud, or coercion would be used to cause that person to engage in a commercial sex act." Id. at 615. Immediately after that, the Court read the elements at issue here for Counts 1 and 2. Id. at 615-17. Then the Court explicitly linked language showing causation with the language at issue:

> If, as in Count 1 and 2, the government alleges that the defendant engaged in sex trafficking while knowingly or in reckless disregard of the fact that force, threat of force, fraud, or coercion would be used to cause a person to engage in a commercial sex act, then the second element of the offense, which the government must prove beyond a reasonable doubt, is that the defendant knew or acted in reckless disregard of the fact that force, threats of force, fraud or coercion would be used.

Id. at 619. The Court also advised the jury that the third element "is that the defendant knew that the victim would be engaged in a commercial sex act." Id. at 620. Despite the ambiguity in the two elements, the instructions as a whole focused the jury on the government's burden to prove the causal link between the unlawful means described and the commercial sex acts.

Williams argues that Rosemond v. United States, 134 S.Ct. 1240 (2014), a case in which the elements of the jury instruction were unclear, should inform our decision. Rosemond concerned jury instructions for aiding and abetting under 18 U.S.C. § 924(c), which criminalizes the use or carrying of a gun "during and in relation to any crime of violence or drug trafficking crime." 134 S.Ct. at 1243. The Supreme Court held that

22

liability for aiding and abetting that offense must include "advance knowledge of a firearm's presence." Id. at 1251. The district court in that case gave the instruction that the defendant was guilty of aiding and abetting that offense if "(1) [he] knew his cohort used a firearm in the drug trafficking crime, and (2) [he] knowingly and actively participated in the drug trafficking crime." Id. Thus, the additional instruction that a defendant must "willfully and knowingly seek[] by some act to help make the crime succeed" did not remedy the absence of "advance knowledge" in that jury instruction.[8] Id. at 1252. The aiding and abetting "umbrella instruction" failed to provide any context to alert the jury that advance knowledge of the gun's presence was needed.

But the situation in Rosemond differs from that here. Here, the surrounding instructions require a causal link between the threats of force, force, fraud, or coercion and the commercial sex acts for Williams to be convicted. In the circumstances, we need

---

[8] The Supreme Court also recognized that the issue with the jury instructions was further compounded by the prosecutor's statement to the jury that "a person cannot be present and active at a drug deal when shots are fired and not know their cohort is using a gun," which sent "the message to the jury . . . that it need not find advance knowledge." Rosemond, 134 S.Ct. at 1252. That is not the situation here because both parties focused extensively on the causation element of the sex trafficking offenses in their opening and closing arguments. See App. at 51, 56-57, 61-62, 545, 548-49. In particular, the government in closing told the jury to consider if Williams knew "that force, threats or force of [sic] coercion would be used to cause a person . . . to engage in a commercial sex act, not every commercial sex act, not the beginning commercial sex act, not most commercial sex acts, just one. You only have to find that that caused them to engage in just one commercial sex act." Id. at 545-46. Williams's counsel made that element the crux of his closing: "But under the law, members of the jury, the force, the threats, the coercion has to cause somebody, a person, to commit a commercial sex act. There has to be a cause and effect. The force, the beatings, the threats, the coercion, has to cause that." Id. at 548-49.

23

not determine whether the use of the special verdict form compounded any error, inasmuch as there was not a plain error or an error at all.

B. The Sufficiency of the Evidence

Williams contends that the evidence was insufficient to support either of his two convictions for sex trafficking by force, fraud, or coercion. He makes three primary arguments: the evidence of his acts of violence toward the two women happened "in the context of complex relationships," Appellant's br. at 42, the evidence at trial at most showed a temporal but not causal connection between the violent acts and the women's commercial sex acts, id. at 44, and the evidence failed to show that he made any threats or used fraud or coercion that caused the women to engage in commercial sex acts. Id. at 46. The government responds that the evidence was sufficient for a rational juror to determine that Williams knew that his use of force, threats of force, or coercion would cause Talia and Erika to engage in commercial sex acts. Appellee's br. at 45.

It is well established that we must uphold a jury's verdict if after our review of the record we conclude that the jury rationally could have found proof of guilt beyond a reasonable doubt. United States v. Caraballo-Rodriguez, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (quoting United States v Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (internal quotation marks omitted)). This standard is "particularly deferential" and we are cautious not to "act as a thirteenth juror." Id. at 430-31. In reviewing a claim concerning the sufficiency of the evidence at trial, we "do not weigh evidence or determine the credibility of witnesses in making [our] determination." United States v. Miller, 527 F.3d 54, 60 (3d Cir. 2008) (quoting United States v. Gambone, 314 F.3d 163,

24

170 (3d Cir. 2003) (internal quotation marks omitted)). Thus, a defendant must "clear a high hurdle to prevail on [a] challenge to the sufficiency of the evidence." United States v. Bailey, 840 F.3d 99, 110 (3d Cir. 2016).

As we detailed above, the statute in relevant part at the time of Williams's offense provided that "whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person" or "benefits, financially or by receiving anything of value, from participation in a venture which has engaged" in one of these acts, "knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act . . . ." is guilty of a criminal offense. 18 U.S.C. § 1591 (2013).

Applying the standard that we set forth above, we hold that beyond any question the evidence was sufficient to support the jury verdict convicting Williams on the two sex trafficking offenses. According to Talia's testimony, Williams hit Erika in front of her the same night he convinced Talia to work as a prostitute for him. Talia testified that she felt at the time that she had few other options because she was in an unfamiliar location with people she did not know and had been required to leave the residence at which she had been staying. Talia turned over to Williams all the money that her "dates" paid her, and he usually allowed her to keep only some money for food. Williams gave her strict quotas to meet, dictated how long she could talk to others, determined whether she would have breaks or days off from work, and prohibited her from talking to certain people. When she talked to one of Williams's associates, Williams threatened to punch her in the

25

face if she did it again. Talia described much of the abuse she witnessed, including how Williams would hit Erika when Erika disagreed with him.

In response to a work-based issue with a prospective client, Williams physically abused Talia and Erika and immediately sent them back outside to solicit clients on the street. This testimony itself provided sufficient evidence upon which a reasonable juror could have found proof that, on that particular day, Williams's use of force was causally linked to their commercial sex acts. According to Talia, Williams used physical violence and threats of violence to ensure that they continued to do what he wanted and to keep them together. Talia lied to the police about Williams' conduct because she felt that the consequences of telling the police the truth about Williams would be worse than the consequences if she lied to them. When Talia tried to leave Williams, she testified that he "kind of coerced [her] not to" do so. Talia finally left Williams when her mother came from Atlanta because she knew she had a chance to leave. There was more than enough evidence to support the verdict finding Williams guilty on Count 1, the count involving Talia.

The evidence also supported a conviction with respect to Erika on Count 2, the count involving her. Although Erika stated that she chose to work for Williams of her own volition, her testimony showed that of all the women that Williams controlled he abused her the most. Williams required Erika to meet a monetary quota every day and demanded that she turn over all the money she received from her acts of prostitution to him. He abused Erika numerous times for disagreeing with him, cut Erika deeply with hair clippers because he held her responsible for the arrest of a friend of his, and he beat

26

her after a prospective client acted strangely towards her. Erika often suffered physical injury from Williams's abuse and as a result had black eyes, swollen lips, and missing teeth. Immediately after many of these assaults Williams sent Erika out to solicit clients on the streets. Erika's mother testified that Williams told her he had to beat or restrain Erika because she had "gotten them both in trouble." Williams also yelled at Erika that he "got to come over there and put a slave trader over top of [her] to do anything," which Erika testified meant that he would send someone to be with her in a physical way. She acknowledged that her relationship with Williams was verbally abusive and detailed Williams's abuse of other women, including his whipping one of them with a telephone cord he pulled out of the wall. This evidence more than sufficed for a jury to determine that Williams's use of force, threats of force, or coercion caused Erika to engage in acts of commercial prostitution.

## C. The Exclusion of Evidence under Federal Rule of Evidence 412

Williams contends that the District Court's exclusion of evidence concerning Erika's prior years of prostitution in accordance with Fed. R. Evid. 412 deprived him of the right to present a defense under the Fifth and Sixth Amendments to the Constitution. Appellant's br. at 52-53. Rule 412 prohibits the admission of "evidence offered to prove that a victim engaged in other sexual behavior" and "evidence offered to prove a victim's sexual predisposition." He claims that this evidence was admissible under an exception to the general rule of inadmissibility in Rule 412 for "evidence whose exclusion would violate the defendant's constitutional rights." Rule 412(b)(1)(C). He proposes three different theories why evidence of Erika's prior acts of prostitution should have been

27

admitted: (1) the evidence was relevant to show that force was unnecessary to cause her to engage in commercial sex acts; (2) it rebutted any claims that he created Erika's and Talia's advertisements online; and (3) it provided a logical chain of inference that Erika chose willingly to work with Williams. Appellant's br. at 53-54; Appellant's Reply br. at 17.

We apply an abuse-of-discretion standard on this exclusion of evidence issue but to the extent that the District Court interpreted the Federal Rules of Evidence our review is plenary. United States v. Duka, 671 F.3d 329, 348 (3d Cir. 2011). In applying an abuse-of-discretion standard, we "afford district courts 'broad discretion on evidentiary rulings'" because they are familiar "'with the details' of the cases in front of them" and have "'greater experience in evidentiary matters.'" Bailey, 840 F.3d at 117 (quoting United States v. Finley, 726 F.3d 483, 491 (3d Cir. 2013)). A reversal is only justified when the district court's decision is "arbitrary" or "irrational." Id. (quoting United States v. Schneider, 801 F.3d 186, 198 (3d. Cir. 2015)).

Rule 412 applies in cases involving "alleged sexual misconduct," conduct that is within the terms of the sex trafficking statute at issue here. See, e.g., United States v. Roy, 781 F.3d 416, 420 (8th Cir. 2015). The evidence ordinarily barred by Rule 412 is only admissible "in designated circumstances in which the probative value of the evidence significantly outweighs possible harm to the victim." See Rule 412 advisory committee's note to the 1994 amendment. There are three exceptions to Rule 412 that can be applicable in criminal cases, one of which Williams argues applies here: a court

may admit "evidence whose exclusion would violate the defendant's constitutional rights." Rule 412(b)(1)(C).

Other courts of appeals in precedential opinions have upheld the exclusion of evidence of an individual's prior acts of prostitution in trials for commercial sex trafficking notwithstanding defendants' arguments similar to those that Williams advances here.[9] These opinions have held either that the evidence is irrelevant in the context of the circumstances in which it was offered or that its relevance is so outweighed by its prejudicial effect with respect to the victim that its exclusion does not violate a defendant's constitutional rights. See United States v. Gemma, 818 F.3d 23, 34 (1st Cir. 2016), petition for certiorari docketed, No. 16-6207 (Sept. 27, 2016) (holding that evidence of prior acts of prostitution "is either entirely irrelevant or of such slight probative value in comparison to its prejudicial effect that a decision to exclude it would not violate [the defendant's] constitutional rights"); United States v. Rivera, 799 F.3d 180, 186 (2d Cir. 2015) (holding that evidence of women's prior prostitution was irrelevant as it "does not suggest that appellants did not later threaten them with violence or deportation in order to coerce them into commercial sex"); Roy, 781 F.3d at 420 (holding that prior acts of prostitution are irrelevant to "whether [the defendant] beat her, threatened her, and took the money she made from prostitution in order to cause her to engage in commercial sex"); United States v. Cephus, 684 F.3d 703, 708 (7th Cir. 2012)

---

[9] Williams cites a number of cases that indicate courts have permitted evidence of prior sex acts, noting that defendants would not appeal a successful motion to admit evidence of prior sex acts under Rule 412. Appellant's br. at 56. Those cases provide little guidance for us because the propriety of the admission of evidence of prior sex acts was not at issue in any of them.

29

(holding that testimony about a victim's prior prostitution to show that she was not coerced or deceived into working for the defendant was irrelevant because it would not show "that she consented to be beaten and to receive no share of the fees paid by the johns she serviced" or "suggest that [the defendant] didn't beat and threaten her").

We need not determine whether the constitutional exception under Rule 412 applies here because, if the District Court erred on this issue, the error would have been harmless. After all, Erika admitted that she had been a prostitute for 12 years prior to her involvement with Williams, stated numerous times that she voluntarily worked as a prostitute for Williams, and testified that she was not motivated by his use of force, threats of force, fraud, or coercion to engage in prostitution. Williams's counsel then capitalized on her admission of prior acts of prostitution in his closing. The exclusion of evidence concerning her prior acts therefore did not prevent Williams from making a defense based on her conduct. See Rivera, 799 F.3d at 189 (noting that even though the court prohibited cross-examining a witness on her prior commercial sex acts, defendant's counsel still was able to use the defense that the victims were not defrauded based on their testimony).[10]

### D. The Absence of a Sua Sponte Charge on an Affirmative Defense

Williams finally argues that he had a defense to the charge of witness tampering because his sole intent in sending his letter to Erika on which the tampering charge was

---

[10] We do not discuss Rule 412 with respect to Talia because there was no evidence at trial that prior to her involvement with Williams that she had engaged in the conduct with which Rule 412 is concerned.

based was to encourage her to testify truthfully. He therefore contends that he was entitled to an affirmative defense instruction on the witness tampering pursuant to 18 U.S.C. § 1512(e) which instructs that a defendant has an affirmative defense if his "conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully." Inasmuch as his counsel did not request this instruction, he argues that the District Court should have given this instruction sua sponte. He contends that the Court committed plain error when it did not give the instruction, and that we should reverse his conviction under 18 U.S.C. § 1512 for witness tampering. Appellant's br. at 60.

The tampering statute under which the jury convicted Williams provides, in relevant part, that "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so," intending to "influence, delay, or prevent the testimony of any person in an official proceeding" is guilty of witness tampering. 18 U.S.C. § 1512(b). 18 U.S.C. § 1512(e) provides an affirmative defense to a tampering charge but the defendant bears the burden of proof by a preponderance of the evidence to show "that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully." 18 U.S.C. § 1512(e).

We review the circumstance that the District Court did not sua sponte provide an affirmative defense in accordance with 18 U.S.C. § 1512(e) for plain error. Fed. R. Crim. P. 30(d); Gov't of V.I. v. Lewis, 620 F.3d 359, 364 (3d Cir. 2010). We therefore determine whether the Court made a "clear" or "obvious" error when it did not give an

31

affirmative defense charge.  See Lewis, 620 F.3d at 364 (quoting United States v. Turcks, 41 F.3d 893, 897 (3d. Cir. 1994)).  Next, we consider whether the claimed error affected substantial rights, i.e., whether it prejudiced the defendant by "affect[ing] the outcome of the trial proceedings."  Id.  Moreover, even if a court commits such an error, an appellate court exercises discretion to correct the error "sparingly" and only will do so if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (quoting Tann, 577 F.3d at 535).

In general, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct. 883, 887 (1988).  In determining whether a court plainly erred in not instructing the jury on an affirmative defense, an appellate court reviews the facts in the light most favorable to the defendant and considers whether there had been sufficient evidence presented at trial to support the claim of error.  See Lewis, 620 F.3d at 364.  But "trial courts generally are under no duty to raise affirmative defenses on behalf of a criminal defendant."  Id. at 370 n.10. "Indeed, by raising affirmative defenses sua sponte, a trial court might actually harm a criminal defendant by undermining defense counsel's strategic decisions."  Id. (citing United States v. Van Kirk, 935 F.2d 932, 934 (8th Cir. 1991)); see also United States v. Tyson, 653 F.3d 192, 212 (3d Cir. 2011) ("A defendant's strategy is his own.  It is not for the district court to sua sponte determine which defenses are appropriate under the circumstances.  In short, if [the defendant] wished to mount [a relevant affirmative defense], it was incumbent upon him to take the initiative to do so.").

32

The District Court did not err when it did not sua sponte charge the jury that Williams was advancing an affirmative defense. After examining the evidence on the affirmative defense issue in the light most favorable to Williams, we conclude that the evidence did not require the Court to give an affirmative defense instruction. Williams testified that he sent Erika the letter to encourage her to tell the truth because the government was pressuring her to lie. App. at 463-64. We are aware that Erika claimed that she told the government that Williams had harmed her because the Federal Bureau of Investigation had threatened to arrest her if she did not do so. Id. at 309. But there was no other evidence to indicate that Williams was attempting to persuade her to testify truthfully.

Further, the evidence makes it clear that Williams did not have the "sole" intention when he wrote Erika to encourage her to tell the truth at trial. After all, Williams testified that he sent the letter because he was "in a really bad situation and [he] need[ed] some help." Id. at 464. Moreover, in his letter to Erika, Williams wrote "you r [sic] my last hope," and "[Talia] & you are their case." Id. at 812. That language implies that his real concern in sending the letter was his own fate. The evidence does not show that he wanted Erika to tell the truth even if it harmed his case. Therefore, the District Court did not commit a plain error or any error at all when it did not give the affirmative defense instruction sua sponte. See Roper v. United States, 403 F.2d 796, 798 (5th Cir. 1968) (a district court's failure to charge an alibi defense sua sponte was not plain error "especially where as here the factual foundation" for it "seems obscure, to say the least").

Williams's counsel was free to ask the District Court to include an affirmative defense instruction in its charge to the jury if he considered it wise to do so. See Lewis, 620 F.3d at 370 n.10; United States v. Atkins, 487 F.2d 257, 259 (8th Cir. 1973) (holding that the trial court did not commit plain error when it did not give an alibi instruction sua sponte because "[a] trial court need not give such an instruction in the absence of a request therefor"); United States v. Sferas, 210 F.2d 69, 71 (7th Cir. 1954) ("[A]ppellate courts will not, generally speaking, pass upon defenses which have not been previously brought to the attention of the trial court."). After our review of the record, we conclude that the evidence gave little, if any, support for giving the affirmative defense. We can understand that counsel may have made the determination that it would have been unwise to ask the Court to charge the jury to consider the affirmative defense as the charge would have placed the burden of proof on that issue on Williams. In this regard, counsel might have deemed it strategically wise to keep the jury solely focused on the force or coercion issues in determining whether the government had proven its case beyond a reasonable doubt, particularly on the sex trafficking charges. We, of course, recognize that we are speculating on counsel's motives in not advancing the affirmative defense. But with or without the speculative possibilities, the Court did not err, let alone commit plain error, when it did not give an instruction on the affirmative defense sua sponte.

## II.    CONCLUSION

For the foregoing reasons, we will affirm the judgment of conviction and sentence entered on April 8, 2015.